[Civ. No. 41872. Second Dist., Div. Five. Nov. 12, 1973.]

BIDART BROS., Plaintiff and Appellant, v.
ELMO FARMING COMPANY, Defendant and Respondent.

## COUNSEL

Conron, Heard & James, Calvin H. Conron, Jr., Crossland, Crossland, Caswell & Bell, William C. Crossland, James M. Bell and Robert L. Sullivan, Jr., for Plaintiff and Appellant.

Borton, Petrini, Conron, Wetteroth, Hitchcock, Werdel & Kuhs and William C. Kuhs for Defendant and Respondent.

## OPINION

**HASTINGS, J.**—Bidart Bros. (Bidart), plaintiff and appellant, sued Elmo Farming Company (Elmo), defendant and respondent, to recover rents collected by Elmo on behalf of Bidart. The rents were on lands sold to Bidart by Elmo but subject to certain leases. The trial court permitted Elmo to set off the rents against claims asserted under purchase price promissory notes and deeds of trust. Bidart appeals.

### FACTS

This case requires an occult skill on behalf of the trial court and this court to perceive the real intent of the parties involved in a complicated real estate transaction where the written documents and actions of the parties relating thereto are often contradictory.

Elmo, a corporate subsidiary of Kern County Land Company (KCL), owned substantial unimproved real property located in the North Kern Water Storage District.[1] On November 1, 1963, Elmo *leased* 10,000 farming acres to its parent corporation, KCL, under 51 different leases, all of which were identical in basic terms. The leases expired on December 31, 1965. The total annual rent was $500,000, one-third of which was due on April 1 of 1964 and two-thirds on December 1, 1964. The payments were the same for 1965.

In January of 1964, Elmo sold the same 10,000 acres, consisting of 40 parcels,[2] to Bidart. The total purchase price was $7,500,000, with a down payment of $1,553,000, the balance to be secured by a purchase money deed of trust (original trust deed). The agreement provided that immediately after close of escrow (January 14, 1964), Bidart could select 2,000 acres from the 10,000 and these would be transferred at once to Bidart in fee simple, free and clear of the original trust deed but subject to said leases. The down payment of $1,553,000 was in reality the purchase price for the 2,000-acre parcel. The remaining 8,000 acres were subject to the original trust deed, but Bidart was given the right to retail the remaining acreage by small parcel sales. If a parcel was sold on an installment-sale basis, the balance of the purchase price woud be evidenced by a substitute promissory note secured by a substitute trust deed on the parcel sold.

On April 23, 1964, the 2,000 acres selected by Bidart were reconveyed from the original trust deed. Bidart entered into a joint venture to retail the remaining 8,000 acres, and by September 20, 1964, had successfully sold all of this property. Substitute promissory notes and substitute trust deeds were issued on each parcel.[3]

The rent payments from KCL to Elmo were evidenced by journal entries on Elmo's books. No payment was actually made by cash or check. The evidence was not clear when the book entries reflecting payment were made, so the parties stipulated that these entries would normally be made

---

[1] The water district was expected to sign a contract with the United States Bureau of Reclamation in late spring of 1964. The contract would limit sales of land in the district to parcels not exceeding 160 acres. However, sales made prior to the signing were without restriction. There is evidence in the record that Elmo in 1963 decided to sell 10,000 acres.

[2] From the record, we discern no relationship between the 51 leases and the 40 parcels that would have any bearing on the issues raised in the trial court or on appeal.

[3] The request for reconveyance of the original trust deed covering the 8,000 acres was made on September 30, 1964. The full reconveyance was recorded on October 7, 1964. In 1965, three parcels (Nos. 28, 29 and 38) from the 8,000 acres were reconveyed to third parties, but all other parcels remained subject to the substitute promissory notes and trust deeds.

during the last week of the month when rent was due or the first week of the following month.

The agreement of sale between Elmo and Bidart encompassed several documents. The key document defining the rights of the parties relevant to this appeal is titled "Supplementary Agreement." Paragraphs 3 and 5 of said document are the determinative sections.[4]

Elmo, as provided in Paragraph 5, collected the rents for Bidart, and in 1964 credited to Bidart's account $480,874 of collected rents received on the entire 10,000 acres, and $500,000 on the entire acreage in 1965. From these credits Elmo paid all taxes on the 10,000 acres for the period from January 15, 1964, to December 31, 1965, and paid to itself interest due or to become due on Bidart's debt obligations.

Elmo accounted to Bidart in December 1964 and 1965. The accounting was on a calendar-year basis. On January 20, 1966, Elmo forwarded to Bidart two checks, the first for $57,649.29, for 1964, and the second for $119,674.84, for 1965. Each check represented the excess of rentals over the property taxes paid and interest due, for the years 1964 and 1965, plus interest paid by Elmo to Bidart at 6 percent per annum. The interest paid by Elmo was computed on the amount owed on January 1 of each year; in other words, the first check covered interest on net pro-

---

[4]"3. Subject to the restriction that the Seller shall not be required to accept cash prepayments on the note secured by the deed of trust in excess of $620,000.00 prior to January 1, 1965, Buyer shall be entitled from time to time to additional partial reconveyances of any one or more entire parcels, by number, upon the following terms and conditions: (a) The Buyer shall pay in cash through an escrow to be opened with Title Insurance and Trust Company, Bakersfield, California, or such other title company as the Seller may designate in writing, the portion of the accrued and unpaid interest and other charges, if any, attributable to each parcel to be reconveyed, plus not less than ten percent (10%) of the release price of said parcel as set forth in the Parcel Release Price List annexed hereto, marked 'Exhibit A' and hereby made a part thereof.

". . . . . . . . . . . . . .

"5. It is understood and agreed by the parties hereto that the forty parcels to be conveyed to Buyer through the purchase and sale escrow are now subject to agricultural leases and subleases expiring December 31, 1965. Seller reserves the right to collect all rentals that may become due and payable under all such leases. So long as the particular parcel from which rent is received remains subject to the original deed of trust, Seller shall apply such rentals, as received, at its option, towards the payment of taxes on the real property, accrued interest, even though not then due and payable, or any unpaid principal on the original note secured by the deed of trust. Rentals collected by Seller on lands subject to a substitute deed of trust given on a partial reconveyance shall be applied by Seller when received, at its option, upon taxes on the lands in said substitute deed of trust, unpaid accrued interest or principal payments on the note secured by said substitute deed of trust."

ceeds in Elmo's possession from January 1, 1965, to January 20, 1966, and the second check was interest on similar funds for January 1, 1966, to January 20, 1966.

The trial court approved Elmo's account but held that Bidart was entitled to 7 percent interest on the moneys owed from December 1 of each previous year (when all of the rent for that year had been paid and the offsets determined) to date of payment.

## ISSUES

Bidart raises four issues on appeal:

1. Was Elmo, the agent (in collecting the rents), entitled to offset the rent it collected from Bidart Bros.' 2,000 acres against claims it asserted against Bidart under purchase price notes secured by trust deeds?

2. Did the court abuse its discretion in permitting, after the case was submitted, the filing of an answer setting out the affirmative defense of setoff?

3. Are the findings supported by the evidence?

4. What is the correct sum due Bidart?

## ARGUMENT

1. ■ The thrust of Bidart's first argument is that the evidence shows that Bidart owned outright 2,000 acres when Elmo received the first and all subsequent rent payments, which should have been paid immediately to Bidart, subject only to an offset for real property taxes paid by Elmo on said acres, or, in the alternative, that Elmo was required to pay interest on the net excess from time of collection to January 20, 1966; that on all of the rents collected by Elmo on the 2,000 acres it was improper to offset indebtedness of Bidart to Elmo pertaining to the 8,000 acres.[5]

It is necessary to state the substance of the trial court's findings of fact and conclusions of law in order to understand the "setoff" theory relied upon by the trial court in rendering judgment for Elmo. The court, in essence, found that (a) on April 1, 1964, Elmo received $147,541.33 in rents from the 10,000 acres, and by April 10 had paid real property taxes on said acres in the amount of $42,524.52; (b) on April 23, 1964, Elmo executed its reconveyance on the 2,000 acres, freeing them from the original trust deed; (c) by September 30, 1964, the remaining 8,000 acres were sold and were subject to substitute promissory notes and substitute

---

[5]Under the theories advanced by Bidart, it would be entitled to additional sums of approximately $47,149.00 (rent and interest to January 20, 1966), plus interest.

trust deeds; therefore, Elmo executed its reconveyance on said acres on the original trust deed. Elmo did not demand, and Bidart did not pay, the accrued and unpaid interest due on the original trust deed at that time; (d) the accrued and unpaid interest owing on September 30, 1964 was $217,937.12; (e) on December 1, 1964, Elmo received rents of $333,-333.00 from the 10,000 acres and before December 10 paid $48,339.16 in real property taxes on said acres (findings were substantially the same, except for amounts, on rents collected and taxes paid in 1965); (f) the rents on the 10,000 acres exceeded real property taxes and interest expense due on the debt obligation in 1964 and 1965; however, in 1964 rents from the 8,000 acres were insufficient to discharge the taxes and interest due on the original trust deed and substitute obligation in 1964, but exceeded said expenses in 1965.

The pertinent conclusion of law, in substance, provided that on December 1, 1964, Elmo was entitled to set off rents from the 2,000 acres pursuant to Code of Civil Procedure section 440 to the extent that rent from the 8,000 acres was insufficient to meet taxes and interest due on the debt obligation.

Bidart claims that an agent receiving moneys to be specifically applied may not set off his obligation to remit to satisfy the agent's claims against the principal. Bidart cites *Engleman* v. *Bank of America,* 98 Cal.App.2d 327 [219 P.2d 868], as supporting. Certain contracts and notes were sold to the bank subject to terms of two agreements between plaintiff and the bank. These agreements set up a reserve fund held in deposit by the bank, which fund could be used only for two specified purposes. The bank collected the moneys, set up the reserve fund as required, but then set off against this reserve fund deposit a debt due it from the plaintiff, although this was not a right given to it under the agreement.

*Engleman* denies a bank the right to set off when the fund in its control is held for a specific purpose. *Engleman* is not controlling here because after the reconveyance of the 2,000 acres there was no specific agreement on how the rent from those acres was to be applied. However, we are still faced with the question of whether an agent has a right to set off when there is no precise agreement concerning application of the funds. Case law is minimal on this issue. Section 421 of the Restatement Second of Agency states: "Rights of set-off or counterclaim may be available to an agent in an action brought against him by the principal.

"a. The privilege . . . is purely statutory. . . . Wheter or not an agent can set off a claim which he has against the principal depends upon

whether or not the particular statute is interpreted as permitting such a claim to be set off in the particular kind of action brought by the principal."

The statute we must look to is Code of Civil Procedure section 440 (superseded by Code Civ. Proc., § 431.70, July 1, 1972): "When cross-demands have existed between persons under such circumstances that, if one had brought an action against the other, a counterclaim could have been set up, the two demands shall be deemed compensated, so far as they equal each other, and neither can be deprived of the benefit thereof by the assignment or death of the other."

The wording neither affirms nor denies the right of an agent to a setoff if the nature of the cross-demands falls within the meaning of the statute. There is no reason why the principal-agent relationship, per se, should deny the agent this statutory right. An agent may set off against money collected a claim against the principal growing out of the same transaction. (See Note 2 A.L.R. 133.) Also, we can look to the agreements as well as the actions of the parties to assist us in determining if a setoff is expressly or impliedly justified. In the case at bar, we have such a situation. Under the original agreement, Bidart was not required to make an interest or principal payment on its indebtedness to Elmo until July 1, 1965 (later amended to December 31, 1966). Paragraph 5 of the supplementary agreement gave to Elmo the right to collect all rents and, at its option, to apply them towards real property taxes, accrued interest (even though not due and payable) or unpaid principal where the rents were received from a parcel subject to the original trust deed or a substitute trust deed. Only the 2,000 acres were fully clear from this condition after April 23, 1964. These provisions were obviously inserted into the agreement to give Elmo security and control over the rents because of the large indebtedness remaining. Extremely important is the fact that when the original promissory note was discharged by Bidart on September 30, 1964, and full reconveyance executed, Bidart paid only the 10 percent release payment, although Paragraph 3 of the Supplementary Agreement provided that to effect full reconveyance the accrued interest on said note of $217,937.12 and the real property taxes advanced of $42,524.52 were required to be paid by Bidart. Elmo, on that date, had collected $147,541.33 from the rent due on April 1, 1964. Elmo reconveyed the deed of trust, as requested, without demanding from Bidart said interest. Nor did Bidart demand the collected rents from the 2,000 acres. Elmo offset the taxes paid from the $147,541.33, leaving a balance on hand of collected rents of $105,016.81. Offsetting this against the accrued interest left a balance due to Elmo of $112,920.31.

We agree with Elmo that the conduct between the parties, as well as the tenor of the agreement, was such that Elmo could infer that it was

authorized by Bidart to offset the rents from the 2,000 acres in order to reduce the $112,920.31.

■ However, Bidart further contends that there can be no offset unless Elmo could set up a counterclaim; that under Code of Civil Procedure section 438 two tests must be met: (a) the counterclaim must tend to diminish or defeat the plaintiff's recovery, and (b) it must exist in favor of a defendant and against a plaintiff between whom a several judgment might be had in the action. It is the second test that Bidart claims Elmo cannot meet, because Elmo in an independent action could not have procured a personal judgment against Bidart upon the purchase money trust deeds. The rationale behind this argument is that section 580b of the Code of Civil Procedure (enacted in 1933) provides that no deficiency judgment shall lie after sale of real property for failure of the purchaser to complete his sale under a trust deed given to the vendor to secure payment of the balance of the purchase price. Bidart argues that it could walk away from the debt, leaving Elmo with a sale of the security as its only remedy. We disagree.

We conclude that setoff is available in this case against a purchase money obligation. A portion of section 438 of the Code of Civil Procedure (superseded in part by Code Civ. Proc., § 428.10, July 1, 1972) reads as follows: ". . . the right to maintain a counterclaim shall not be affected by the fact that either plaintiff's or defendant's claim is secured by mortgage or otherwise, nor by the fact that the action is brought, or the counterclaim maintained, for the foreclosure of such security: . . ."

In 42 California Law Review (1954) page 902, the author reasons as follows: "If, as the section states, 'demands shall be deemed compensated, so far as they equal each other,' they must be deemed compensated irrespective of any later action one of the parties might take, irrespective of any remedy he might pursue. To hold otherwise would impose such a constrictive limitation on the right of setoff as to render the plain terms of the section practically nugatory. If the right to setoff were to be made contingent on the choice of action by the one against whom it is asserted, it would be virtually no right at all." See also 1 Witkin, Summary of Cal. Law (7th ed. 1960) Security Transactions in Real Property, § 50, pp. 742-743: "A special exception is made in the counterclaim statute: . . . It would seem that, under this statute, the secured creditor may not only counterclaim for foreclosure but may disregard the security and counterclaim on the debt."

In *Roseleaf Corp.* v. *Chierighino* (1963) 59 Cal.2d 35 [27 Cal.Rptr. 873, 378 P.2d 97], the opinion states at page 42: "Section 580b places

the risk of inadequate security on the purchase money mortgagee. A vendor is thus discouraged from overvaluing the security. Precarious land promotion schemes are discouraged, for the security value of the land gives purchasers a clue as to its true market value. [Citations.] If inadequacy of the security results, not from overvaluing, but from a decline in property values during a general or local depression, section 580b prevents the aggravation of the downturn that would result if defaulting purchasers were burdened with large personal liability. Section 580b thus serves as a stabilizing factor in land sales."

The language of section 438, permitting setoff to a secured claim, is unambiguous, and the reason for enacting section 580b, as enunciated in *Roseleaf Corp.*, was to remedy a problem far different from the one facing us here. Section 580b, while it limits the remedy between the parties, does not change the contractual obligations between the parties prior to default. We cannot sympathize with Bidart's argument that it could walk away from the debt. Certainly, by taking such a position, it had a duty to tell Elmo it desired to default when it requested the reconveyance on the 8,000 acres covered by the original trust deed and owed $217,937.12. Without such notice, it strengthens Elmo's position that it was entitled to seek full payment on the balance due from rents on the entire 10,000 acres. As applied to the facts before us, we conclude that section 580b does not nullify the clear language of section 438 and does not prevent setoff because the purchase money obligation is involved.[6]

2. ▪▪▪ Bidart next argues that the trial court abused its discretion in permitting the filing of an amended answer affirmatively pleading the defense of setoff after close of trial.

Elmo made a motion in court to amend its answer to set up said affirmative defense. It was opposed by Bidart for the reason that, had it been given an opportunity, it could have established a waiver of the defense or an estoppel to assert it. The court permitted the filing of the amended answer.

Elmo's position is that a setoff pursuant to section 440 of the Code of Civil Procedure need not be affirmatively alleged, but a motion to amend

---

[6]The agreement and substance of the findings of fact justify another reason for denying Bidart's claims to the rent proceeds or interest thereon on the April 1964 rents collected from the 2,000 acres. The court found the rents were paid on April 1, 1964, and we uphold this finding. At that time, the 2,000 acres were subject to the original trust deed, and Elmo could apply rents therefrom, as it in fact did, without use of the offset theory. It is the interest Bidart claims was withheld from it on the April 1964 rents that comprises the substantial portion of its claim.

to conform to proof was made at the conclusion of evidence out of an abundance of caution.

Case law directly in point is scarce; however, Howell, *Counterclaims and Cross-Complaints in California* (1937) 10 So.Cal.L.Rev. 415, 428-429, footnote 99, states: ". . . Under this view of the section in question, the compensation of one demand by the other could be shown under a denial or plea of payment and, consequently, there would be no necessity of pleading the one as a counterclaim or cross-complaint in the action upon the other. It apparently follows, therefore, that where demands exist within the provisions of Cal. Code Civ. Proc., § 440, and are, therefore, 'deemed compensated' the defendant nevertheless may plead the one as a counterclaim (provided it complies with the requirements of Cal. Code Civ. Proc., § 438) or as a cross-complaint (providing it complies with the requirements of § 442 of said code) in an action upon the other claim, or, under some circumstances, at least, may claim an automatic compensation of such demands and benefit therefrom under either a denial or a plea of payment without the necessity of any further pleading upon his part." Also, 44 California Jurisprudence 2d, Setoff and Counterclaim, section 3, pages 789-790: ". . . And in view of the rule that compensating cross demands effect automatic present payment, it has been urged that the rule should be that a pleading is unnecessary, and that the compensation of one demand by the other may be shown under a denial or a plea of payment." Lending support to the above, but varying on the fact situations, are *Hauger* v. *Gates,* 42 Cal.2d 752 [269 P.2d 609], and *Jones* v. *Mortimer,* 28 Cal.2d 627 [170 P.2d 893].

However, assuming that setoff need be affirmatively alleged, the trial court did permit the amendment, and if there is no abuse of discretion, Bidart is precluded from urging reversal on this issue.

■ Allowance of amendments to conform to the proof rests in the sound discretion of the trial court, and abuse of discretion is not shown unless prejudice appears and unless new and entirely different issues are thus brought into the case. The greatest liberality is encouraged in this respect. (*Crown Prod. Co.* v. *Cal. Food etc. Corp.,* 77 Cal.App.2d 543, 550 [175 P.2d 861]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 1058, p. 2634.)

■ Bidart asserts it could have established a waiver of the defense of setoff or an estoppel to assert it. To support this contention, Bidart refers us to an exhibit not in evidence. This exhibit included purchase and sale escrow instructions covering sale of a parcel in the remaining 8,000 acres. When it was offered, attorneys for Elmo stated that there was no objection

to the trust deed and promissory note, as they were relevant to the accounting, but the escrow instructions were irrelevant as to the contract of sale of the 10,000 acres. At the court's suggestion, it was then marked for identification. No foundation or offer of proof was then or later made that would enable the trial court to rule on its admissibility in evidence. Bidart claims the court's ruling precluded it from valuable evidence going to the question of waiver. Bidart incorrectly interprets the record. The trial court, in suggesting that the item in question should be marked for identification, did not preclude proper foundation or an offer of proof. It is also obvious from the record that Elmo, from the very beginning, set off the rent collections against debts owed by Bidart. This was exemplified in the three accounts rendered by Elmo to Bidart in December 1964 and December 1965 and January 20, 1966. It is difficult to understand how Bidart was surprised and not prepared on this element of the case, as the setoffs go to the very heart of the entire litigation. We do not find from the record that the trial court abused its discretion in permitting the amendment to the answer to conform to proof.

3. ▮ Bidart contends that findings of fact Nos. 4, 9, 12, 16, 21 and 22 by the trial court are not supported by the evidence. Findings 4, 9, 12 and 16 are related and, in brief, state that Elmo received the rents from KCL on April 1, 1964, December 1, 1964, April 1, 1965 and December 1, 1965. ▮ " '[I]n examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, *taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. . . .*' [Citation.]" (Italics added.) (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, p. 4237.)

▮ Application of this established rule to the facts here requires us to sustain the findings. The leases state that rent was to be paid on April 1 and December 1 of each year. It is not unusual that rents are in fact "paid" by book entry when due from a subsidiary to a parent company, or vice versa. Journal entries do not necessarily reflect date of payment and are often made subsequent thereto. Copies of the pertinent journal pages were admitted into evidence. They show footnotes, appropriately referenced, that tie the payment into the leases and sale agreement.[7]

---

[7]The April 1964 journal footnote is: "To record ⅓ of $500,000 annual rental due on lands sold to Bidart on or before 4/1/64 per lease agreement dated 11/1/63."

The December 1964 journal footnote is: "To record the remaining ⅔ of 500,000 annual rental on lands sold to Bidart approx. 12/366 to Elmo Frmg. Co. & 354/366 to Bkfd Elmo [indistinguishable]."

The April 1965 journal footnote is: "To record ⅓ of $500,000 annual rental due

Real property tax payments made by Elmo on behalf of Bidart further substantiate the findings that Elmo paid the taxes on behalf of Bidart on the 10,000 acres in early April and December of 1964 and 1965. The court could reasonably infer that they were paid from rents received.

■ We turn our attention to findings of fact Nos. 21 and 22, the substance of which was that reasonable dates for reporting the rents received and the taxes and interest set off therefrom were December 1, 1964, for the year 1964, and December 1, 1965, for the year 1965.

Bidart contends there was no testimony or other evidence to support the fact that a reasonable accounting date was December 1 of each of the years 1964 and 1965 and argues it is entitled to interest on the rents collected on its behalf by Elmo from date of receipt, and not December 1 of 1964 and December 1 of 1965. (Date of receipts under Bidart's theory would be the end of April 1964 and 1965 and the end of December in the same two years.) Evidence was presented that Elmo operated on a calendar year, and that most of the agricultural leases were on the same basis. The 51 leases involved here were the same, with the principal payment (two-thirds) being made on December 1 of each year. Elmo supplied Bidart with annual accounts in 1964 and 1965, prepared on a calendar-year basis, yet Bidart made no objection to them after receipt. The rights of Bidart were not substantially affected by the accounting years approved by the trial court, as the following facts illustrate. We concluded earlier that the trial court was not in error in ruling that the first rents received were on April 1, 1964. At that time, Paragraph 5 of the Supplementary Agreement permitted Elmo to retain and credit all rents received in April of 1964 from the 10,000 acres. No interest, therefore, is due from the collection of these rents.

All rents collected from the 2,000 acres subsequent to April 1, 1964, were held by Elmo as agent for Bidart, and the question is whether an agent is liable for interest upon moneys collected for the principal, absent an agreement pertaining to same. "Unless otherwise agreed, an agent who has received. . . money for the principal has a duty to . . . deliver [it] to the principal upon his demand when the amount due him has been ascertained. The agent may also have a duty to . . . notify the principal of the collection, or to remit the . . . money to him within a reasonable time." (Rest. 2d Agency (1958) § 427.)

from KCL Co. on lands sold to Bidart on or before 4/1/65 per lease agreement dated 11/1/63."

The October 1965 journal footnote is: "To record the remaining ⅔ of 500,000 annual rental on lands leased from Bidart."

"The agent is not liable for interest upon collections until a cause of action arises with respect to them. . . ." (*Id.* com. h.)

On December 1, 1964, and December 1, 1965, Elmo collected two-thirds of the annual rent on the 10,000 acres. The trial court allowed Elmo offsets, as discussed earlier, on those dates and required Elmo to pay 7 percent interest per annum on the excess rents collected from each December 1 to date of payment on January 20, 1966. (Elmo had paid interest at 6 percent on the excess from January 1, 1965 and January 1, 1966.) Therefore, on both December 1 payments Bidart received all the interest to which it is entitled.

Interest was not paid by Elmo on the excess rent collected from the 2,000 acres on April 1, 1965, to December 1, 1965. We apply the same elementary rule: that we are required to accept as true all evidence tending to establish the correctness of the trial court's findings. The documents affirming the sale agreement were silent concerning interest; therefore, the trial court could resolve this issue. (12 Cal.Jur.2d, Contracts, § 129, p. 341.) The accounting period allowed was not unreasonable because total offsets against total revenue were undetermined until December 1 of each year, when two-thirds of the annual rent was paid.[8]

Bidart should not complain, as it actually benefited more than the agreement allowed under Elmo's accounting. Paragraph 5 of the Supplementary Agreement provides that rentals collected by Elmo on lands subject to a substitute deed of trust shall, at Elmo's option, be applied, in addition to taxes and accrued interest, to unpaid principal. Elmo did not apply the excess rents from the 8,000 acres (less the three lots fully conveyed) to unpaid principal, but remitted the excess of rents over taxes and interest, plus interest on the excess, to Bidart. This was a windfall to which Bidart was not entitled.

The accounting to Bidart was not unfair; it was reasonably justified from all the circumstances surrounding the agreement and the parties' actions relating thereto.

■ Bidart, in its closing brief, alleges that Code of Civil Procedure section 440 is unconstitutional because it is an extrajudicial remedy and falls within the principles enunciated in *Fuentes* v. *Shevin* (1972) 407 U.S. 67 [32 L.Ed.2d 556, 92 S.Ct. 1983]; *Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820]; *Blair* v. *Pitchess* (1971) 5 Cal.3d 258 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]; *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536 [96 Cal.

---

[8]The net rent on the 2,000 acres held by Elmo on April 1, 1965, was $26,891.57. Interest on this amount to January 20, 1966, at 7 percent per annum is $1,367.40.

Rptr. 709, 488 P.2d 13]; et al. This was not urged at the trial level or even in Bidart's opening brief. " 'It is the general rule applicable in civil cases that a constitutional question must be raised at the earliest opportunity or it will be considered as waived.' [Citation.]" (*Hershey* v. *Reclamation District No. 108* (1927) 200 Cal. 550, 564 [254 P. 542]. See also *Savoy Club* v. *Board of Supervisors*, 12 Cal.App.3d 1034, 1042 [91 Cal.Rptr. 198]; *Jenner* v. *City Council*, 164 Cal.App.2d 490, 498 [331 P.2d 176].)

The judgment is affirmed.

Kaus, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied November 29, 1973, and appellant's petition for a hearing by the Supreme Court was denied January 10, 1974.